## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Devonte Willis (#M-49638),    ) | |
| ) | |
| Plaintiff,    ) | |
| ) | Case No. 23 C 50375 |
| v.    ) | |
| ) | Hon. Iain D. Johnston |
| Monica Carpenter, et al.,    ) | |
| ) | |
| Defendants.    ) | |

### MEMORANDUM OPINION

Plaintiff Devonte Willis, an unrepresented prisoner in Illinois Department of Corrections ("IDOC") custody, has brought this action under 42 U.S.C. § 1983 against members of the medical staff at the Dixon Correctional Center ("Dixon"), whom he accuses of being deliberately indifferent to his serious medical needs. He claims that Defendants were deliberately indifferent to treating infections in his knee that developed after a series of self-harming incidents when Plaintiff cut open his knee and inserted metal wires into the wound. All Defendants have moved for summary judgment. The Court grants their motions, concluding that Plaintiff did not suffer a violation of his Eighth Amendment rights.

### Background

Except where noted, the following facts are undisputed.[1]

The parties to this action are: (1) Plaintiff Devonte Willis, an inmate at Dixon Correctional Center ("Plaintiff"); (2) NP Kristina Mershon, a nurse practitioner licensed by the State of Illinois and employed by Wexford Health Sources, Inc. ("Defendant Mershon"); and (3) IDOC-employees

---

[1] At a prefiling conference, the Court fully explained in detail the requirements of summary judgment briefing. Dkt. 66.Plaintiff has filed responses to both Defendant Mershon and the IDOC Defendants' LR 56.1 statements of material facts. LR 56.1(e)(3). He has also filed an additional statement of facts in response to the IDOC Defendants. And, lastly, he has filed several response "briefs" and "memoranda". Plaintiff's factual responses frequently do not comply with the Local Rules, *see* LR. 56.1(e)(2), (3), in that they do not cite to the record when disputing Defendants' asserted facts and consist of legal argument or unsupported conclusions. The Court will disregard these responses. *See Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1018 (N.D. Ill. 2018) (court may disregard any part of factual statement or response that consists of legal arguments or conclusions). And where Plaintiff has not properly responded to a certain fact or has admitted it, the Court will accept it as true to the extent supported by the record. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). Nonetheless, although the Court is entitled to demand strict compliance with Local Rule 56.1, *see Coleman v. Goodwill Indus. of Se. Wis., Inc.*, 423 F. App'x. 642, 643 (7th Cir. 2011), it will generously construe the facts identified by Plaintiff to the extent they are supported by the record. *See Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016) (courts may construe *pro se* submissions leniently). The Court will not look beyond the cited material, however. *See Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 898 (7th Cir. 2003) ("[D]istrict courts . . . are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them.").

Monica Fuller, the Health Care Unit Administrator at Dixon, and Holly Spencer, the Director of Nursing at Dixon (collectively "IDOC Defendants"). (Dkt. 51, Mershon SOF, ¶¶ 1-2; Dkt. 63, IDOC SOF, ¶¶ 2-3.)

Although Spencer is a registered nurse, as the Director of Nursing, her role was administrative, not clinical. (IDOC SOF, ¶¶ 64-65.) She possessed no authority to independently order, deny, or override a specific course of treatment. (*Id.*, ¶ 65.) She does not have the ability to reassign an NP to a prisoner, nor does she oversee, facilitate, or coordinate Wexford staff or their actions. (*Id.*, ¶ 65.) And as an RN rather than an NP, Spencer, unlike NP Mershon, cannot prescribe medication or determine a course of treatment. (*Id.*, ¶ 66.) Similarly, although Fuller is also a registered nurse, as the Healthcare Unit Administrator ("HCUA") at Dixon, her role was strictly administrative. (*Id.*, ¶ 69.) She had no authority to direct or change Wexford NP's assignments and no authority to prescribe medication or deny/override/change the course of treatment for an inmate. (*Id.*, ¶ 70.)

On July 6, 2022, Plaintiff injured himself by inserting pieces of copper wire about four to five inches long into a cut he had made on his left knee. (Mershon SOF, ¶¶ 6–8.) Defendant Mershon testified that when a foreign body is inserted into a patient's knee, a removal of the foreign body may be indicated based on the location and depth of the foreign body insertion. (*Id.*, ¶ 58.) Nurse practitioners may perform uncomplicated foreign body removals, *i.e.*, removals of objects that are not deep within the body or with otherwise reduced potential for secondary complications. (*Id.*) If a patient does not wish for foreign body removal, or the risks of foreign body removal outweigh the benefits, the standard of care does not necessitate removal. (*Id.*, ¶ 60.) Likewise, when the removal of a foreign body is not medically necessary, the standard of care involves the prevention or mitigation of any infection, the administration of pain medications, and lifestyle modification to avoid exacerbating activities. (*Id.*) Defendant Mershon testified that Plaintiff's case was such that the foreign body removal could have been completed onsite by a nurse practitioner or medical doctor. (Mershon SOF, ¶ 59.)

On July 8, 2022, NP Susan Tuell, a non-party to this case, removed one of the wires, but Plaintiff declined to have her remove the second wire because he began to find the procedure too painful. (*Id.*; Dkt. 73, Resp. Mershon, SOF ¶ 7.) NP Tuell then prescribed Plaintiff Rocephin and Bactrim, two antibiotics for his knee. (*Id.*, ¶¶ 6–8.)

On July 15, 2022, NP Mershon saw Plaintiff for the first time as it related to his self-inflicted knee injury. (Mershon SOF, ¶¶ 9 – 11.) At that time, her exam of Plaintiff's left knee was limited because the prison was on lockdown and she could only assess him through his cell door. (*Id.*) Plaintiff reported that he continued to experience pain and that one wire was still in his knee. (*Id.*) Nonetheless, Plaintiff did not appear in any distress and had an upright and steady gait. (*Id.*) Defendant Mershon noted that another nurse had advised her that during a recent dressing change, Plaintiff's wound had erythema, some swelling, but scant serosanguineous drainage. (*Id.*) She instructed Plaintiff to continue taking his antibiotics, the risks of not doing so, and to avoid further self-harm. (*Id.*) She planned for Plaintiff to continue receiving dressing changes and to see her again for a follow-up appointment in a few days. (*Id.*) She also noted Plaintiff had Tylenol and Mobic available for his knee pain. (*Id.*) On July 21, 2022, NP Chelsea Sword, another non-party, saw Plaintiff for a follow-up on his left knee, at which time Plaintiff stated his wound was "almost

closed" and did not appear in any distress. (*Id.*, ¶ 12.)

On July 29, 2022, Defendant Mershon saw Plaintiff again, at which time he reported that his knee was "still not right." (*Id.*, ¶ 13.) His knee was slightly inflamed with a small open wound, but there was no discharge. (*Id.*) Plaintiff was joking throughout the appointment, had an upright and stable, yet slow, gait and did not appear in any distress. (*Id.*) Defendant Mershon diagnosed Plaintiff with a foreign body insertion to his left knee and then prescribed Bactrim, an antibiotic, noted his active prescriptions for pain medications, and referred him to a local orthopedist. (*Id.* ¶ 14.) One week later, on August 5, 2022, Wexford Health Sources approved this referral request. (*Id.*, ¶ 15.) Defendant Mershon – it is not disputed – is not involved with scheduling off-site appointments for inmates, which is a task assigned to the writ office staff. (*Id.*, ¶ 68.) She hands all her referral requests for off-site treatment directly to the writ office for processing and scheduling. (*Id.*)

On August 11, 2022, Defendant Mershon saw Plaintiff in the prison infirmary, where he reported that his knee had worsened. (*Id.*, ¶ 17.) It was inflamed, tender, and secreting a thick yellow-brown discharge. (*Id.*) He also had decreased range of motion in the knee and a small open wound where he had inserted the wires. (*Id.*) Defendant Mershon noted that Plaintiff had failed oral antibiotics, and she diagnosed him with cellulitis of his knee. (*Id.*) She then had Plaintiff admitted acutely to the prison's infirmary and planned for Plaintiff's knee to be cleansed and covered until it was healed. (*Id.*, ¶ 18.) She also prescribed Ciprofloxacin ("Cipro"), a different antibiotic, to be administered intravenously, ordered a wound culture, and prescribed him Tylenol #3 for his pain. (*Id.*) She noted that Plaintiff was scheduled to see an orthopedist on August 23, 2022. (*Id.*)

Plaintiff's medical records of his infirmary stay contain notes by a nurse that Plaintiff refused some doses of his Cipro, but Plaintiff denies that he refused his antibiotic at this time. (*Id.*, ¶¶ 19 – 23; Resp. Mershon SOF, ¶¶ 19 – 23.) On August 15, 2022, non-party Dr. Sy received the results of the wound culture, which showed that Plaintiff had e. coli in his wound and that it was susceptible to Augmentin, another kind of antibiotic. (Mershon SOF, ¶¶ 22 – 23.) At that time, Dr. Sy changed Plaintiff's antibiotic to Augmentin and discharged him from the prison infirmary. (*Id.*)

On August 17, 2022, Defendant Mershon saw Plaintiff at the request of a nurse who, when changing Plaintiff's dressings, noted that his left leg was much bigger than his right leg, with swelling under his left knee down to his foot. (*Id.*, ¶¶ 25 – 26.) The nurse noted that Plaintiff had a red-colored ring below his knee with copious amounts of drainage. (*Id.*) Defendant Mershon, finished her rounds and then saw Plaintiff as soon as possible. (*Id.*, ¶ 26.) On exam, she noted Plaintiff had increased edema in his left knee, extending into his foot. (*Id.*) She noted Plaintiff had a prior history of failed episodes of antibiotic therapy due to his non-compliance with the treatment plan, diagnosed him with cellulitis, and then sent him emergently to the emergency room at KSB Hospital. (*Id.*)

While at KSB, Plaintiff underwent a CT scan of his left knee that showed the presence of a metallic foreign body in his knee. (*Id.*, ¶¶ 27 – 28.) The following day, August 18, 2025, Dr. Thomas Hernandez, an orthopedist, surgically removed the wire from Plaintiff's knee without any

complications. (*Id.*, ¶ 29.) After multiple follow-up appointments at KSB Hospital with Dr. Hernandez in August, September, and October, Plaintiff's knee healed, and he was discharged on October 19, 2022 from Dr. Hernandez's clinic with no restrictions. (*Id.*, ¶¶ 30 – 32.)

One week after his release from the orthopedist, on October 27, 2022, Defendant Mershon saw Plaintiff again for another complaint of left knee pain. (*Id.*, ¶ 33.) At that time, Defendant Mershon noted Plaintiff's Tylenol #3 prescription was ending, but he still had Tylenol available. (*Id.*) She also prescribed Naproxen, an NSAID medication, to begin when the Tylenol #3 prescription completed. (*Id.*) Plaintiff, however, says that his Tylenol #3 prescription had expired in August. (Resp. Mershon SOF, ¶¶ 33-34.) On November 1, 2022, Defendant Mershon saw Plaintiff again and reminded him that his prescription for Tylenol #3 had just expired and he would be receiving Naproxen instead. (*Id.*, ¶ 34.) Defendant Mershon then saw Plaintiff on two other occasions during November 2022, when he continued to complain of knee pain, so she adjusted the dosage of his pain medication and prescribed him a new medication, Voltaren. (*Id.*, ¶¶ 35–36.)

On December 7, 2022, NP Mershon saw Plaintiff for a writ return appointment, at which time he reported he had inserted another foreign body into his knee (the precise date of this incident of self-harm is not in the record). (*Id.*, ¶ 37.) She submitted a referral request to the writ office for Plaintiff to see an orthopedist, which she noted on a January 3, 2023 appointment with Plaintiff, had been approved. (*Id.*)

Defendant Mershon then continued to periodically see Plaintiff and monitor and treat his knee. (*Id.*, ¶¶ 38–41.) First, on January 3, 2023, NP Mershon saw Plaintiff for a complaint of on-going knee pain. (*Id.*, ¶ 38.) On exam, Plaintiff's left knee showed very trace edema at the medial aspect, and NP Mershon saw no redness or open areas. (*Id.*) Defendant Mershon granted Plaintiff's request to change his Tylenol prescription to three times a day rather than two times a day until his pending orthopedic appointment. (*Id.*) Next, on February 16, 2023, NP Mershon saw Plaintiff for another complaint of left knee pain. (*Id.*, ¶ 39.) However, Plaintiff primary complaint once at the appointment was a spider bite on his stomach, which Defendant Mershon cleansed. (*Id.*) On March 23, 2023, NP Mershon saw Plaintiff to again assess his knee. (*Id.*, ¶ 40.) He reported that "it just had a little scab on it[,]" and NP Mershon observed a very small pinpoint opening at the 12:00 position of his left knee, with no surrounding cellulitis. (*Id.*) She instructed Plaintiff to apply a Band-Aid to the site daily and planned for additional evaluations of his knee until it healed. (*Id.*) She also advised Plaintiff to follow-up as needed. (*Id.*) On April 11, 2023, Defendant Mershon saw Plaintiff for a complaint of left shoulder pain. (*Id.*, ¶ 41.) Her notes from this visit also include observations of Plaintiff's knee: he had an upright and steady gait, with no deformity or swelling to his knees, and Defendant Mershon planned to continue Plaintiff's then-present course of management. (*Id.*) Plaintiff denies that he was seen for his knee that day. (Resp. Merson, SOF ¶ 41.) At all of the above appointments, Plaintiff demonstrated full range of motion in his left knee, along with an upright and steady gait. (Mershon SOF, ¶¶ 38–41.)

On April 12, 2023, as she entered Plaintiff's housing unit to conduct rounds, Defendant Mershon saw Plaintiff playing tackle-football with several other inmates in custody. (*Id.*, ¶ 42.) She observed Plaintiff running at full speed and tackling, catching and passing a football, and he showed no signs of limitation or discomfort. (*Id.*) She also noted that Plaintiff's activity was

witnessed by other correctional officers. (*Id.*)

On April 17, 2023, a nurse saw Plaintiff at sick call for a complaint of knee pain. (*Id.*, ¶ 42.) The nurse noted that Plaintiff had a pin-sized hole on the side of his left knee. (*Id.*) The nurse saw no signs or symptoms of infection. (*Id.*) The nurse noted Plaintiff had orders for acetaminophen/ibuprofen in place and referred him to be seen by a provider. (*Id.*) On April 20, 2023, Defendant Mershon saw Plaintiff for a follow-up on his left knee pain. (*Id.*, ¶ 43.) Plaintiff stated, "we already talked about it the other day" and denied any concerns. (*Id.*)

During this period, Plaintiff wrote to the IDOC Defendants regarding his medical care. First, on March 7, 2023, Plaintiff wrote a letter to Defendant Spencer complaining about the lack of medical care he was receiving. (IDOC SOF, ¶ 67.) Specifically, Plaintiff sought more effective pain medications. (*Id.*) To respond to the letter, she first reviewed Plaintiff's medical records and observed that he was receiving care and had a forthcoming ortho appointment. (*Id.*, ¶ 68.) On March 17, 2023, Defendant Spencer responded to Plaintiff, by stating that "[m]easures have been put in place to address your concerns." (*Id.*, ¶ 67.) The response to the letter was consistent with IDOC policies. (*Id.*) Second, on April 7, 2023, Plaintiff wrote a letter to Defendant Fuller about the ineffectiveness of his current pain medications and his dissatisfaction with NP Mershon's course of treatment. (*Id.*, ¶ 71.) Plaintiff requested to "receive access to adequate medical treatment and service" and that he "be prescribed adequate pain medications to help [his] pain and also to be seen by a Doctor." (*Id.*) On April 18, 2023, Defendant Fuller responded to Plaintiff's letter by informing him that his "offender request has been received" and to "[p]lease discuss your pain medications with a provider." (*Id.*, ¶ 72.) The response is consistent with IDOC policy. (*Id.*)

On June 8, 2023, Defendant Mershon saw Plaintiff to assess his knee upon a referral from a nurse. (Mershon SOF, ¶ 45-46.) Plaintiff stated he had "a little more" swelling to his left knee, but no new complaints. (*Id.*) Defendant Mershon noted minimal swelling on his left knee, but no open wounds. (*Id.*) She noted that Plaintiff was waiting to see an orthopedist. (*Id.*) On June 22, 2023, Defendant Mershon saw Plaintiff again for his complaint of knee pain, and she planned to remove the wire onsite at the prison. (*Id.*, ¶ 47.) However, Defendant Mershon ultimately decided it would be better to let the prison's Medical Director, Dr. Larry Sy, remove the wire. (*Id.*, ¶ 48.) However, when Dr. Sy attempted to do so, Plaintiff and the staff argued when he was asked to take off his hat; Defendant Mershon says that he then refused the appointment, whereas Plaintiff says he was told to leave. (*Id.*, ¶ 49; (Resp. Mershon, SOF ¶ 49.)

On July 19, 2023, Plaintiff saw Dr. Shawn Wynn at ORA Orthopedics. (*Id.*, ¶ 50.) He noted that Plaintiff's x-ray showed five metallic bodies in his left knee, and he planned for an incision and drainage of Plaintiff's knee, along with a removal of the foreign body, once the procedure was approved by prison staff. (*Id.*) That evening, back at the prison, a nurse saw Plaintiff who noted that his knee had a 2cm open wound that was draining. (*Id.* ¶ 51.) The nurse noted that as she cleaned Plaintiff's knee, a piece of copper wire emerged, which she then removed. (*Id.*)

On July 20, 2023, Defendant Mershon saw Plaintiff for a medical writ follow-up and noted that Plaintiff's left knee had a small wound with scant drainage. (*Id.*, ¶ 52.) An x-ray at that time showed the presence of four metallic bodies in Plaintiff's knee. (*Id.*) Defendant Mershon planned to refer Plaintiff back to ORA for the recommended surgical procedures and planned that Plaintiff

5

continue to receive dressing changes until then. (*Id*.)

On August 4, 2023, Dr. Wynn at ORA removed the foreign bodies from Plaintiff's knee without issue. (*Id*., ¶ 53.) On August 8, 2023, Defendant Mershon saw Plaintiff for a medical writ follow-up, at which time Plaintiff reported that his medications were working and denied any further issues. (*Id*., ¶ 54.) She noted that Plaintiff's knee did not show the presence of any cellulitis and referred him back to Dr. Wynn's office for a follow-up. (*Id*.) On August 28, 2023, Plaintiff returned to Dr. Wynn's office, at which time a nurse practitioner assessed Plaintiff, noted his knee was well-healed, and discharged him from Dr. Wynn's care without any restrictions. (*Id*., ¶ 55.)

Plaintiff then went back to his activities of daily living, including exercising three to four days a week, performing leg raises, squat to stand exercises, running, jumping, sitting and standing, and playing tackle football. (*Id*., ¶ 56.) Plaintiff says that he continues to experience pain in his left knee. (Resp. Merson SOF, ¶ 56.)

## Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden in establishing that no material facts are in genuine dispute. *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 160 (1970). Any doubt as to the existence of a genuine issue is resolved against the moving party. *Id*.

## Analysis

The Eighth Amendment protects prisoners from officials' deliberate indifference to their serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To prevail on a claim that his medical care violated the Eighth Amendment, Plaintiff must establish two elements: (1) he suffered from an objectively serious medical condition and (2) the defendants were deliberately indifferent to that condition. *See Lockett v. Bonson*, 937 F.3d 1016, 1022 (7th Cir. 2019) (citing *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011)).

All parties agree that Plaintiff's knee condition constitutes a serious medical condition. This case is about the second element: deliberate indifference. To show deliberate indifference, "a plaintiff must establish that [the] official knows of and disregards an excessive risk to inmate health or safety or that the official is both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he draws the inference." *Johnson v. Dominguez*, 5 F.4th 818, 825 (7th Cir. 2021). Establishing deliberate indifference "requires a showing of something approaching a total unconcern for the plaintiff's welfare in the face of serious risks." *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022. As shown below, the record cannot support a finding of deliberate indifference as to any Defendant.

### A. Defendant Mershon

This is a case in which the treater—Defendant Mershon—undisputedly made significant efforts to treat the prisoner. Under the deliberate indifference standard, providers in her position

are shielded from liability for their treatment decisions "unless no minimally competent professional would have so responded under the circumstances." *McDaniel v. Syed*, 115 F.4th 805, 832 (7th Cir. 2024) (citations omitted). Indeed, "[t]o survive summary judgment" against an active treater like Defendant Mershon in this case, Plaintiff "need[s] to present evidence sufficient to show that [a medical professional's] decision was 'so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment.'" *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 664 (7th Cir. 2016) (citation omitted); *see also White v. Woods*, 48 F.4th 853, 862 (7th Cir. 2022) (treatment must be "so inadequate that it demonstrated an absence of professional judgment"); *Johnson v. Rimmer*, 936 F.3d 695, 707 (7th Cir. 2019) (same). In assessing a claim that a prisoner was subjected to treatment devoid of medical judgment, the court should "look at the totality of an inmate's medical care". *Riley v. Waterman*, 126 F.4th 1287, 1295 (7th Cir. 2025) (quoting *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc)).

The record in this case establishes that Defendant Mershon promptly referred Plaintiff for off-site removals of the wires from Plaintiff's knee after each instance of self-harm and his refusal of an on-site extraction. While Plaintiff waited for those appointments to come to fruition, Defendant Mershon (or in some instances another treater) saw and examined Plaintiff consistently – sometimes several times a month – whenever he lodged a complaint with respect to his knee over the course of the year at issue. Defendant Mershon and his treaters kept Plaintiff's wounds clean and dressed, and she prescribed Plaintiff with multiple types and rounds of different oral and intravenous antibiotics, including Rocephin, Bactrim, Cipro, and Augmentin. Defendant Mershon modified the prescriptions based on Plaintiff's responses or lack thereof to the antibiotics. She also ordered a would culture, and his antibiotic was changed again based on the culture's results. Then, immediately upon learning that Plaintiff's situation had become emergent, she sent Plaintiff to the ER at an outside hospital. She also provided Plaintiff with several different kinds of pain medication, including Ibuprofen, Tylenol, Tylenol #3 (*i.e.*, with Codeine), Naproxen, and Voltaren. She (and other treaters) modified the doses based on Plaintiff's clinical presentation, his subjective complaints of pain, and his requests. Despite Plaintiff's repeated instances of self-harm and his own repeated refusal to have the wires extracted sooner on-site, his course of care ultimately resolved Plaintiff's infection and led to two successful extractions of the wires. Plaintiff now enjoys full and normal function of his knee.

Considering this totality of medical care Plaintiff received and his outcome, there was no Eighth Amendment violation. Defendant Mershon did not delay in referring Plaintiff for outside treatment; she did not ignore Plaintiff or turn him away; and she did not obdurately adhere to ineffective treatment. Rather, Defendant Mershon's treatment of Plaintiff outlined above clearly demonstrates a consistent exercise of medical judgment resulting in a course of evolving treatment well within the standard of care that she testified to (and Plaintiff did not counter). *See, e.g., Kyles v. Williams*, 679 F. App'x 497, 499-500 (7th Cir. 2017) (prison medical professionals were entitled to summary judgment because a series of appointments and reasonable medical attention for prisoner's knee issues demonstrated that providers did not consciously disregard a serious risk of harm); *Wilson v. Adams,* 901 F.3d 816, 821–22 (7th Cir. 2018) (affirming grant of summary judgment on claim of deliberate indifference where "totality" of care showed proper attention to inmate's pain). At the very least, there is certainly nothing in the record nor in the sequence of events that suggests that Defendant Mershon's medical decisions were "so far afield of accepted professional standards as to raise the inference that [they] [were] not actually based on medical

judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *see also Johnson*, 936 F.3d at 707; *Whiting*, 839 F.3d at 664.

Plaintiff's response materials in large part express a general dissatisfaction with his care, and he seems to harbor the misguided understanding that his personal dissatisfaction itself creates a genuine dispute of fact. But before this case must be presented to a jury, Plaintiff was required to present evidence from which a jury could infer that Defendant Mershon's treatment was so inappropriate as to be essentially devoid of medical judgment. He did not. Plaintiff's "mere disagreement with the course of treatment is not evidence of deliberate indifference." *Lewis v. Sood*, 126 F.4th 525, 531–32 (7th Cir. 2025).

Plaintiff points to only one specific aspect of his care that he believes was so inappropriate that it arose to deliberate indifference. He believes that Defendant Mershon should have sent him to KSB Hospital immediately on August 11, 2022, when his wound was secreting a discharge, rather than six days later on, August 17, 2022. (Dkt. 75, PMEM, pg. 1-2.) He emphasizes that Defendant Mershon gave him the "wrong" antibiotic during that time, and he also insists that his condition was the same on the 11th as it was on the 17th, so the purported "delay" is inexplicable. (*Id.*; Resp. Mershon SOF ¶¶ 57-62.)

Plaintiff has not shown deliberate indifference to his needs during this time. As set forth above, Defendant Mershon made significant efforts to treat Plaintiff's infection during the period at issue. On August 11, 2022, she admitted Plaintiff to the infirmary so that he could receive a new antibiotic, Cipro, intravenously. She also ordered a wound culture, and when the culture revealed the presence of e. coli in his wound, a prison-physician changed his antibiotic to Augmentin, which is indicated to treat that type of infection. When his leg nonetheless swelled (which was not in fact the case on the 11th), Defendant Mershon sent Plaintiff emergently to KSB Hospital. Although it is unfortunate that Defendant Mershon's initial efforts to treat Plaintiff's infection within the prison were not effective, "the Constitution guarantees . . . treatment within the applicable standard of care, not a specific outcome.". *Page v. Obaisi*, 318 F. Supp. 3d 1094, 1104 (N.D. Ill. 2018)). Plaintiff has presented no evidence that Defendant Mershon's treatment decisions – including the choice of Cipro initially – were outside the standard of care, let alone not based on the medical judgment. *Johnson*, 5 F.4th at 826; *Allen v. Frank*, 246 F. App'x 388, 391 (7th Cir. 2007) (explaining that medical professional's treatment decision does not rise to an Eighth Amendment violation "unless the medical treatment was so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition"). His personal belief and his bald speculation that she should have chosen a different antibiotic right off the bat or that he should have gone to the ER sooner are not enough to defeat summary judgment. *See generally Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 934 (7th Cir. 2021) (a party "must present more than mere speculation or conjecture to defeat a summary judgment motion."); *see also Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (summary judgment is the 'put up or shut up' moment in a lawsuit."). Again, a plaintiff's mere "[d]isagreement with a treatment plan" or even "evidence of negligence or medical malpractice" does not establish an Eighth Amendment violation. *Cuesta v. Barker*, 738 Fed. App'x 882, 885 (7th Cir. 2018); *see, e.g., Hatcher v. Jones*, No. 25-1432, 2026 WL 268250, at *2 (7th Cir. Feb. 2, 2026) (affirming summary judgment for medical professionals who did not follow specialist's recommendations for wound care and wound became infected).

8

Plaintiff's response materials also suggest that he was generally dissatisfied with Defendant Merson's efforts to manage his pain. But here too Plaintiff has not shown that she exhibited *deliberate indifference* towards his pain. She provided Plaintiff with several different kinds of pain medication, including Ibuprofen, Tylenol, Tylenol #3 (*i.e.*, with Codeine), Naproxen, and Voltaren. She (and other treaters) modified the doses based on Plaintiff's clinical presentation, his subjective complaints of pain, and his requests. A prisoner is "not entitled to his preferred set of medications and treatments" so long as his medical providers "did not act recklessly". *Broadfield v. Williams*, 768 Fed. App'x 544, 549 (7th Cir. 2019). Although it is unfortunate that Plaintiff apparently continued to experience some knee pain during the relevant period, adequate care does not require the total alleviation of pain and discomfort. *See Garza v. Wexford Health Sources, Inc.*, No. 19-2321, 2022 WL 3443775, at *10 (C.D. Ill. July 18, 2022) (citing *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996)); *Arce v. Wexford Health Sources, Inc.*, 75 F.4th 673, 681 (7th Cir. 2023) (Eighth Amendment "does not . . . impose the unrealistic requirement that doctors keep patients completely pain-free"); *Leiser v. Hoffman*, No. 20-2908, 2021 WL 3028147, at *3 (7th Cir. July 19, 2021) ("doctors are not deliberately indifferent when they are unable to eliminate completely a patient's pain").

Finally, although Plaintiff himself does *not* focus on any lapse of time while he waited for off-site wire extractions, the Court notes for the sake of completeness that Defendant Mershon promptly referred Plaintiff for the off-site care following both incidents of self-harm and was undisputedly not responsible for the ultimate scheduling of those procedures. She therefore cannot be held liable for any purported "delay". *See, e.g., Turner v. Paul*, 953 F.3d 1011, 1016 (7th Cir. 2020) (concluding that defendants who had no control over scheduling appointments with outside provider could not be held liable under section 1983 for failing to schedule appointment or failing to "nag" the individuals responsible for scheduling appointments); *see also Lyke v. Lank*, No. 21 C 50066, 2024 WL 3904630, at *7 (N.D. Ill. Aug. 22, 2024) (explaining that plaintiff cannot establish deliberate indifference without evidence that defendant had control over scheduling delayed appointment); *Wells v. Dominguez*, No. 3:17-cv-50087, 2022 WL 17718421, at *6 (N.D. Ill. Dec. 15, 2022) (explaining that defendant can be held liable for delays in scheduling only if evidence shows defendant had control over the circumstances that caused delays).

For all the above reasons, the Court concludes that Defendant Mershon is entitled to summary judgement. No reasonable jury could conclude that she was deliberately indifferent to Plaintiff's medical needs.

## B. IDOC Defendants

Plaintiff contends that the IDOC Defendants' responses to his letters complaining about his prescribed course of pain management exhibited deliberate indifference on their parts. (Dkt. 78, PRESP-IDOC, pg. 1-2.) He asserts that he made the IDOC Defendants aware of the "ineffectiveness" of his pain treatment, but they "ignored" his requests for assistance. (Dkt. 79, PSOF, ¶¶ 1, 3.) The IDOC Defendants argue, however, that deliberate indifference cannot be found when Plaintiff was receiving medical care, and they – given their purely administrative roles – deferred to the medical judgment of his providers. (Dkt. 61, IDOC Mem., pg. 8-19.)

The Court concurs with the IDOC Defendants. The Seventh Circuit has recognized repeatedly that when prisoners are under the care of medical professionals, administrative prison staff may generally trust the professionals to provide appropriate medical attention. Thus, courts typically do not hold administrative prison staff liable for deliberate indifference in a case when a prisoner is under medical providers' care. *See Burks v. Raemisch,* 555 F.3d 592, 596 (7th Cir. 2009) ("A layperson's failure to tell the medical staff how to do its job cannot be called deliberate indifference"); *Greeno v. Daley,* 414 F.3d 645, 656 (7th Cir. 2005) (when inmate is under the care of doctors, "a non-medical prison official will generally be justified in believing that the prisoner is in capable hands.") (cleaned up) s*ee also Johnson v. Snyder,* 444 F.3d 579, 586 (7th Cir. 2006) (fact that medical staff was addressing prisoner's medical needs insulated the warden from liability). In a rare case, if a non-medical defendant has reason to believe a prisoner may not be receiving constitutionally adequate medical care, he or she may have an obligation to at least investigate the complaint. *Hayes v. Snyder,* 546 F.3d 516, 527 (7th Cir. 2008).

There is no question that Plaintiff was receiving medical attention at all times relevant. Even though his communications to the IDOC Defendants expressed his personal dissatisfaction with his pain treatment, he has presented no evidence showing an out of the ordinary situation when an administrative official like Fuller or Spencer should have been alerted to an Eighth Amendment violation. Any and every complaint by a prisoner does not automatically give an administrator reason to suspect that the prisoner's care is violating the constitution. As explained above, a plaintiff's personal disagreement with his care or desire for a different medication does not demonstrate deliberate indifference. Under the circumstances of this case, there is no basis for finding the IDOC Defendants to have been deliberately indifferent where they knew Plaintiff was receiving treatment for his pain and deferred to Plaintiff's medical treaters as to the precise course of that treatment.

For these reasons, the Court concludes that the IDOC Defendants are entitled to summary judgement. No reasonable jury could conclude that they were deliberately indifferent to Plaintiff's medical needs.

## **CONCLUSION**

The Defendants' motions for summary judgment [50] [60] are granted, and this case is dismissed with prejudice. Judgment shall enter separately for the Defendants. Civil case terminated.

Date:  March 16, 2026          By:  _____

Iain D. Johnston
United States District Judge

10